IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | 3:24CR00001 LPR |
| JAMES CHARLES HART ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, by and through its attorneys, Jonathan D. Ross, United States Attorney for the Eastern District of Arkansas, and Jordan C. Crews, Assistant United States Attorney for said district, respectfully submits this sentencing memorandum for the Court's consideration.

**I.   Summary of the case**

**A.   Procedural History**

On January 9, 2024, James Charles Hart (Hart), was indicted in a one-count Indictment with Possession of a Firearm by Dishonorably Discharged Person, in violation of Title 18, United States Code, Section 922(g)(6).

On July 2, 2024, Hart was indicted in a two-count Superseding Indictment with Possession of a Firearm by Dishonorably Discharged Person and Possession of an Unregistered NFA weapon.

On January 6, 2025, Hart pled guilty to Count One of the Superseding Indictment. A Presentence Investigation Report ("PSR") has been prepared, which places the defendant at a Guidelines range of 63-78 months imprisonment (PSR paragraph 62).

**B.   Statement of the Facts**

On August 26, 2021, James Charles Hart was discharged from the United States Navy under dishonorable conditions after being convicted for advocating supremacist and extremist

doctrine, ideology and causes, larceny of military property, and violations of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D) related to selling firearms without a license. He was sentenced to 23 months in the Brig. As part of his criminal conduct, Hart was in possession of a Sig Sauer handgun bearing serial number B227201 in his personal quarters on base. (Exhibit A, General Court-Martial Transcript, page 97). The firearm was taken into evidence during the search of Hart's personal quarters and after sentencing the firearm was released to Hart's mother. Hart was informed due to his discharge under dishonorable conditions that upon release from the Navy Brig he would be prohibited from possessing firearms. Additionally, Hart's sentencing document indicated that he could not possess a firearm. On December 12, 2022, Hart was released from the Brig and ultimately went to live with his father.

During 2023, numerous neighbors saw Hart walking around with firearms. On April 2, 2023, Hart was seen by neighbors carrying an AR pattern rifle, with nine or ten magazines on a tactical vest patrolling for looters (PSR paragraph 8). In the year between his release from the Brig but before arrest on December 7, 2024, Hart also filmed himself carrying weapons, while simulating combat. In one of these videos taken August 14, 2023, Hart is seen crawling through a hole in the ground wearing khaki, operating a flashlight while carrying a pistol (Exhibit B). In another video taken October 9, 2023, Hart is seen walking thru waist deep water down the center of a creek wearing hunter green carrying an AK pattern rifle (Exhibit C). In yet another video, Hart is recording the view from a scoped rifle as Hart views and sights his rifle on people in the area (Exhibit D). In a video from June 16, 2023, Hart records himself with a scoped, AR pattern rifle, fitted with what appears to be a suppressor simulating him clearing a room (Exhibit E).

Law enforcement received numerous reports of Hart being in possession of firearms including AR-pattern rifles and a shotgun. On November 19, 2023, a deer was registered for James Charles Hart with the Arkansas Game and Fish that he killed in Cross County and labeled the weapon as modern gun. Sergeant Myers with the Arkansas Game and Fish went to Hart's residence in Wynne, Arkansas, to talk to Hart. Hart told Sgt. Myers that he hunted with a Mossberg model 500 shotgun and killed the deer on November 19, 2023. During a search of his cellphone after his arrest, FBI found that Hart had recorded the killing of the deer on November 18, 2023 (Exhibit F). The video shows Hart, after sundown, running after the deer on foot until the deer grows tired, and Hart shooting the deer with a pistol.

On December 7, 2023, the Federal Bureau of Investigation (FBI) executed a search warrant at Hart's residence in Wynne, Arkansas and an arrest warrant for Hart. During the search of the residence, Hart's car and the car Hart was traveling in at the time of his arrest, FBI discovered 20 guns possessed by Hart including:

1. a Glock, .22 caliber handgun, bearing serial number AEBT194;
2. an Anderson Manufacturing, multi-caliber rifle, bearing serial number 15206272;
3. a WASR-10, 7.62x39 rifle, bearing serial number A1-51863-16RO;
4. a Ruger, .22 caliber rifle, bearing serial number 234-76354;
5. an American Tactical handgun, bearing serial number 15206272;
6. a Glock, 9mm handgun, bearing serial number TEG259;
7. a Walther Arms, .380 acp handgun, bearing serial number S060161;
8. a Sig Sauer, 9mm pistol, bearing serial number 47E041148;

9. a Sig Sauer, 9mm pistol, bearing serial number B227201;

10. a Mossberg, 12-gauge shotgun, bearing serial number J276407;

11. a Sig Sauer, 9mm pistol, bearing serial number M18A044612;

12. a Mossberg, 12-gauge shotgun, bearing serial number V0562795;

13. a Mossberg, 12-gauge shotgun, bearing serial number G905409;

14. a Springfield Armory, 308 caliber rifle, bearing serial number 3445221;

15. a Izhmash (IMEZ), 20-gauge shotgun, bearing serial number 012707118B;

16. a Remington, 20-gauge shotgun, bearing serial number N818098K;

17. a Mosin-Nagant, 7.62x56r rifle, bearing serial number 000091;

18. a Mauser, 7.97x57 rifle, bearing serial number 1777;

19. a Savage Arms Inc., .22 caliber rifle, bearing serial number 2449529; and

20. a Bushmaster, multi-caliber rifle, bearing serial number L518815.

The search also revealed thousands of rounds of ammunition, loaded and unloaded magazines associated with the rifles and handguns with 15 plus rounds of capacity, tactical gear, ballistic helmets, body armor, gas masks, and confederate and Nazi flags. Hart possessed the firearms, ammunition, and previously mentioned items. Specially, Hart possessed the Sig Sauer handgun, bearing serial number B227201 which was previously seized during his dishonorable discharge and later released to his mother. Hart, using his father as a go-between, obtained the firearm from his mother (Exhibit G, Text messages). The Anderson Manufacturing, multi-caliber rifle, bearing serial number 15206272 has a barrel of less than 16 inches. The Mossberg, 12-gauge shotgun, bearing serial number J276407 was modified to have a barrel of less than 18 inches in length. Hart's bedroom and living area contained firearms 7-20. Hart had firearms 1-5 in his

Toyota Camry. Hart possessed firearm 6 when he was arrested.

The firearms functioned as designed, were not manufactured in the state of Arkansas, and traveled in interstate commerce either before or during the defendant's possession of them. At the time of the defendant's possession of the firearms, the defendant had been previously and knowingly discharged from the Armed Forces under dishonorable conditions.

## II. Law and Requested Sentence

All of the factors outlined in Title 18, United States Code, Section 3553(a) support a sentence above the guideline range, and the United States requests an upward variance to 180 months' imprisonment in the Bureau of Prisons.

The guidelines do not accurately account for Hart's conduct, history and characteristics. In particular, the nature and circumstances of the offense, the defendant's history and characteristics, the need for the sentence to protect the public from further crimes of the defendant, to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence to criminal conduct, and the kinds of sentences available are the 3553(a) factors that are most informative in arriving at a requested sentence above the guideline range.

"The district court has 'substantial latitude to determine how much weight to give the various factors under § 3553(a).'" *United States v. Lewis*, 576 Fed. Appx. 629, 631 (8th Cir. 2014) (citing *United States v. Waller,* 689 F.3d 947, 960–61 (8th Cir. 2012) (per curiam)) (*quoting United States v. Ruelas–Mendez,* 556 F.3d 655, 657 (8th Cir. 2009)), "[S]entencing courts may take into account not only 'a defendant's prior convictions, but...also [his] past criminal behavior, even if no conviction resulted from that behavior.'" *Alabama v. Shelton*, 535 U.S. 654, 665 (2002). (quoting *Nichols v. United States*, 511 U.S. 738, 747 (1994)).

Regarding the type of proof that may be considered, "Congress has provided that 'no limitation shall be placed on the information concerning the background, character, and conduct of a person' that a court may 'consider for the purpose of imposing an appropriate sentence.'" *United States v. Schlosser*, 558 F.3d 736, 740 (8th Cir. 2009) (quoting 18 U.S.C. § 3661). "[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Id*. (quoting *United States v. M.R.M.,* 513 F.3d 866, 870 (8th Cir. 2008)).

Another set of factors that can and ought to be considered in arriving at a sentence are the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to adequately deter criminal conduct. Certainly, a lengthy prison sentence would also serve to deter others who might commit criminal conduct similar to Hart. A significant sentence is appropriate and necessary to reflect the seriousness of the offense, to promote respect for the law, and to adequately deter criminal conduct.

### A. Nature and Circumstances of the Offense

The government contends that the nature and circumstance of the offense warrant an upward variance due to the nature of the firearms, the number of firearms, planned conduct with the firearms and the dangerous nature of his possession of firearms. As mentioned previously, Hart was in possession of thousands of rounds of ammunition, body armor, twenty guns and numerous semi-automatic magazines. While the sentencing guidelines do reflect a person with eight or more guns, the fact that Hart possessed two and a half times as many guns required for the enhancement, coupled with thousands of rounds of ammunition, and magazines warrants a variance.

Additionally, section 2K2.1(a)(4)(B) accounts for possessing a firearm described in 26 U.S.C. § 5845(a) but the offense conduct also includes numerous semiautomatic firearms that are cable of accepting a large capacity magazine not accounted for under the guideline. The government contends this combination warrants a variance.

Notably, during a search of Hart's cellphone, a text conversation was discovered between Hart and a fellow militia member on June 22, 2023 (Exhibit H, Robbery Report). In the conversation, Hart (using name Nathan Hale) informs Militia member "Tex" of a "possible raid on a Lebanese target (P.H.) close to you in East TN stating "We need a 4th man. It's not a kill mission"… I've done worse." The conversation then details the identity of the target, a map of the compound, and where the target is located. Hart then sends "Tex" a drawing of the inside of the target address (Exhibit I), and ariel photos of the address (Exhibits J & K). Hart tells "Tex" that a militia member (Flyboy *) has been working the target as a mark and has been inside the compound. Hart references a chat to discuss any questions. On the phone, FBI discovered a screen shot of a chat group on Signal (Exhibit L). When "Tex" tells Hart that he has no weapons or gear, Hart references that they have that covered and that he has three sets of kit for 3 men and hardware.

During the same search of Hart's cellphone, a conversation on November 26, 2023 was discovered between Hart (using name_$!<Other>!$_*) and S.S. (Flyboy *.) (Exhibit M, Report Travel to TN November 2023). In the messages, Hart and S.S. plan for Hart to come stay at S.S.'s place for a couple days. The stated purpose for the trip in the texts is to hunt, shoot and hike. The travel destination is Newport Tennessee where S.S. and P.H. both reside. On a video recorded November 28, 2023, Hart and S.S. wear ski masks, carrying AK pattern rifles and semi-automatic handguns, discuss tactics and pose for pictures (Exhibit N). On November 30, 2023, an unmasked

Hart records himself with an unmasked S.S. hiking thru the woods with S.S. stating "naw that is OPSEC." (Exhibit O).

FBI later interview P.H. and he confirmed that he did not draw the map (Exhibit I) and the map was accurate as of September 2023. P.H. thought the person who drew the map was likely S.S.. P.H. stated S.S. previously were friends who had met in a gun shop around May of 2022. P.H. said during their past friendship S.S. visited his house approximately a dozen times. S.S. even agreed to cat sit while Hadad was out of town for a week.

The search of the phone also revealed numerous videos of Hart possessing a firearm in a particularly dangerous manner. Exhibit D shows Hart viewing people (including children) through a rifle scope. At the end of Exhibit D, Hart appears to lead a walking person with the cross hairs of his scoped rifle. Exhibit F shows Hart running thru the woods at night while carrying a loaded pistol before he shoots the exhausted animal at close range. The behavior depicts very dangerous behavior with firearms and warrants a variance.

B. **Defendant's History and Characteristics**

Hart has previously been involved with the Military Court system. Hart, now 26, was previously dishonorably discharged from the Navy and received a sentence of 23 months imprisonment in the Brig (PSR Paragraph 38). As part of the allegations, Hart advocated violence against others due to their race, sexual orientation and beliefs. Hart also advocated violence against fellow service members. Additionally, Hart possessed a firearm on the military installation, sold firearms for profit without a license, and shot a firearm out of a moving vehicle. In addition to the conduct detailed in PSR Paragraph 38, the Court Martial Transcript details Hart (ACC) and the Military Judge's (MJ) description of the actions that formed the basis for the Court Martial:

    MJ: Do you believe that –were you advancing, encouraging or advocating the use of force, violence or criminal activity or otherwise advancing efforts to deprive individual of their civil rights?

    ACC: Yes, sir.

(Exhibit A, page 58)

    MJ: To further preparation for possible conflict, you advocated violence toward military members; is that true?

    ACC: Yes, sir.

    MJ: Did you state to a civilian associate, R.M. to, "Kill and take U.S. Navy gear. I don't give a fuck if I served with them. Killing them." Did you say those things?

    ACC: Yes, Sir.

(Exhibit A, page 63)

    MJ: Did you further state to R.M. that, "When the boog happens, all U.S. Navy Seals are shoot on sight targets"? Did you state that?

    ACC: Yes, Sir.

(Exhibit A, page 65)

    MJ: And when you said these things, did you mean these things?

    ACC: Yes, Sir.

    MJ: These weren't said in gest?

    ACC: No, Sir.

    MJ: So, you were actively advocating to kill, to take Navy gear and to kill U.S. Navy Seals; is that correct?

    ACC: Yes, Sir.

(Exhibit A, page 66)

    ACC: During this time period, I made statements to civilian associate, R.M. advocating violence toward the National Guard, including, "Can't wait to terrorize the National Guard.

I'm going to white death the National Guard. Wage my own war against them. Sniping them guerilla still (style). Pop then run. Just say the sleeper cell activation word and I'm mobile.'

(Exhibit A, page 69-70)

ACC: During this time period, in reference to violent anti-government activity, I told associate, J.S., "We need to meet up and strategize boog movements. My guys have med supplies all together. We don't have good comms gear and we aren't completely a hundred percent on the arsenal. We have cops and EMTs. It's getting to the point where guys are targeting Black Lives Matter and then with explosive persuasion. I'm close to just resorting to raiding armories."

(Exhibit A, page 79)

MJ: … in reference to violent, anti-government activity and support of causes which advocate the use of force, violence and criminal activity, did you encourage a civilian associate, P.M., to recruit individuals, obtain weapons and to scout out "hideout" locations?

ACC: Yes, Sir.

MJ: Did you do those things?

ACC: Yes, Sir.

MJ: How many times did you do those things?

ACC: Multiple times.

MJ: Between 1 June and to on or about 13 January 2021?

(Exhibit A, page 89)

MJ: Do you believe and admit that your failure to follow DOD Instruction 1325.06, dated 27 November 2009, incorporating change 1, effective February 22nd, 2012, was wrongful?

ACC: Yes. Sir.

MJ: Why was it wrongful?

ACC: I was aware of the order and was actively advocating violence and the use of force against military members as well as civilians, sir.

(Exhibit A, page 92)

MJ: At this time, I want you to tell me why you're guilty of the offense listed in Specification 3 of Charge I. Tell me what happened?

ACC: Your Honor, I believe I am guilty of this specification because on or about January 2020, on Naval base here in San Diego, I had a privately owned pistol on base in my barracks room in violation of Captain Love's lawful written order.
Exhibit A page 97

MJ: At this time, I want you to tell me why you are guilty of the offense listed in Specification 1 of Charge V. Tell me what happened?

ACC: Your Honor, I believe I'm guilty of this specification because between 21 October 2020 and January 20—20 January 2021, in Arkansas and San Diego, I engaged in the business of dealing firearms without a license that violated federal law.

(Exhibit A, page 130)

MJ: At this time, tell me why you're guilty of the offense in Specification—the sole Specification under Additional Charge II. Tell me what happened.

ACC: Your Honor, I believe I'm guilty of this specification because on or about 25 December 2019, I was in Searcy, Arkansas, on leave. I was in a car driven by a civilian friend. We were driving on private property. It was not a public road.

As we were driving, I was shooting a rifle out the window of s vehicle. I was not shooting at anything in particular. I was just firing out the window. I understand this was negligent and I was not exercising due care.

(Exhibit A, page 153)

Hart's prior Court Martial shows a pattern of advocating violence, possessing firearms, selling firearms, and recklessly discharging firearms. The egregiousness of this course of conduct which took place on numerous occasions warrant a variance.

Hart's criminal history and current charges show a pattern of criminal conduct that started before his Court Martial and continued relatively unchanged until he was incarcerated on December 7, 2023. Hart possessed firearms and planned for violence, recklessly handled firearms, and possessed illegal guns before his Court Martial and continued so after his release from the

Brig until his return to confinement on December 7, 2023. Hart's history and characteristics warrant an upward variance.

### C. Need for the Sentence to Protect the Public from Further Crimes of the Defendant, Promote Respect for the Law, and Afford Adequate Deterrence to Criminal Conduct

As detailed above, the defendant has engaged in repeated egregious criminal conduct. Despite a Court Martial and almost two years in the Brig, the defendant continues to engage in criminal conduct. In only a year after Hart's release from the Brig, Hart obtained 20 guns, thousands of rounds of ammunition, and body armor. As early as four months after his release, Hart was seen by the neighbors carrying weapons. In a jail call after Hart pled guilty, Hart indicated his unwillingness to follow rules of supervised release after his release from prison (Jail call Exhibit P, 6:18). At this point, Hart has not been deterred from criminal conduct and does not appear amenable to the rules of supervised release. The government requests a sentence to specifical deter Hart, to protect society, generally deter criminal conduct, and promote respect for the law.

Considering all of the Title 18, United States Code, Section 3553(a) factors an upward variance is warranted, appropriate, and needed. Not only would a significant sentence communicate to others in the Central Arkansas the seriousness of the conduct, but it would also deter the criminal conduct of others, and more importantly, specifically deter Hart from committing crimes. A variance would send a clear message that federal violations of this nature, will result in prison sentences commensurate with the seriousness of the offense.

### III.     Conclusion

WHEREFORE, for the reasons detailed above, the United States respectfully requests sentence of 180 months in the Bureau of Prisons with three years of supervised release.

Respectfully submitted,

JONATHAN D. ROSS
United States Attorney

By: JORDAN C. CREWS
Assistant U.S. Attorney
AR Bar 07299
425 West Capitol Ave.
Little Rock, AR 72203
(501) 340-2600
jordan.crews@usdoj.gov
